# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Richmond Division

LISA A. MAKSON,               )
and others similarly situated,  )
                               )
           Plaintiff,       )
                               )      CIVIL NO. 3:07-cv-00582-HEH
v.                            )
                               )
PORTFOLIO RECOVERY ASSOCIATES, LLC,  )
                               )
           Defendant.     )

## MEMORANDUM IN SUPPORT OF MOTION TO STRIKE MEDIATION AGREEMENT

Defendant, Portfolio Recovery Associates, LLC ("PRA"), submits this memorandum in support of its Motion to Strike Mediation Agreement.

### I. SUMMARY OF ARGUMENT

On January 15, 2008, this putative class action was mediated before Judge Dennis W. Dohnal. During the mediation, the parties reached an agreement on a tentative class action settlement, which was memorialized in a Mediation Settlement Agreement ("Agreement"). Plaintiff, Lisa A. Makson, contends the Agreement is a binding *class action settlement agreement* per Fed. R. Civ. P. 23. Plaintiff is wrong. Pursuant to Fed. R. Civ. P. 23(d) and (e), PRA requests the Agreement be struck and an order be entered confirming this case is not settled as a class action.

PRA is mindful of the fact that "settlement is a generally accepted—and often preferred—means of dispute resolution." *Ramey v. Director, Office of Workers' Compensation Program*, 326 F.3d 474, 478 n. 5 (4th Cir. 2003). However, "in order for [any] settlement to be effective, it must comply with the normal rules of contract law, and there must be a 'meeting of the minds' as to the terms of the agreement." *Said v. Virginia Commonwealth*

*University/Medical College of Virginia*, 130 F.R.D. 60, 63 (E.D. Va. 1990).   Further, "[a] settlement agreement by definition should end litigation," *not* create it.   *Wood v. Virginia Hauling Co.*, 528 F.2d 423, 425 (4th Cir. 1975).   Plaintiff and her counsel have forsaken these basic legal tenets and rules of common sense in a rush to enforce the Agreement as a class action settlement agreement.

As explained below, the Agreement cannot be enforced for at least 3 reasons.   First, the Agreement is unenforceable because it is an "incomplete agreement."   The Agreement represents nothing more than a mere "agreement to agree."   In other words, the parties never intended to be bound by the Agreement, until and unless additional material terms were negotiated and a formal class action settlement agreement was signed.   Moreover, the Agreement is an unenforceable "incomplete agreement" because the parties never agreed on all material terms and settlement documents.

Second, the Agreement contemplates that no class member will be issued a 1099 tax form by participating in the settlement, but the law requires that such tax forms be issued. Considering that this material settlement term regarding no 1099s cannot be satisfied, the Agreement fails.

Finally, and perhaps most importantly, the preliminary settlement discussed during the January mediation and memorialized in the Agreement cannot be approved as a class action settlement per Fed. R. Civ. P. 23(e).   The settlement is neither fair nor adequate because it treats similarly situated class members *different*, even though all of the class members allegedly sustained the *same* "injury."

PRA remains open to settling this case, but the parties must reach an agreement that will "pass muster" and receive this Court's approval.   It makes no sense to spend the time and money

associated with the class action settlement process—drafting the numerous, required settlement documents, sending notice to the class members, and attending the hearings—if the settlement is unfair or inadequate and will be attacked by objectors or intervenors and will not ultimately be approved by this Court.

## II. PROCEDURAL HISTORY AND FACTS

### A. Background and the State Court Collection Lawsuit

PRA is a debt buyer. On October 28, 2005, PRA purchased plaintiff's account from Providian National Bank. On May 24, 2007, PRA commenced a collection lawsuit against plaintiff in Virginia state court by filing a Warrant in Debt, along with related exhibits.

### B. Plaintiff's Class Action Lawsuit

On September 21, 2007, plaintiff filed this action, asserting class claims against PRA under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.* Plaintiff alleges that PRA violated the FDCPA by failing to include on the state court exhibits filed with the Warrant in Debt the disclosures required by § 1692e(11).[1]

Plaintiff's proposed class consists of "(i) all consumers with addresses within the Commonwealth of Virginia; (ii) who were a [d]efendant in a collection action brought by the filing of a Warrant in Debt in one of the General District Courts of the Commonwealth by PRA within the one-year period preceding the filing date of this Complaint; (iii) in which PRA also sent an 'Affidavit of Ownership,' an 'Affidavit for Default Judgment,' or a 'PRA-NET screen

---

[1] *See* 15 U.S.C. § 1692e(11) ("A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section . . . [t]he failure to disclose in the initial written communication with the consumer and, in addition, if the initial communication with the consumer is oral, in that initial oral communication, that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose, and the failure to disclose in subsequent communications that the communication is from a debt collector, except that this paragraph shall not apply to a formal pleading made in connection with a legal action.").

print' to the consumer; and (iv) in which those documents failed to contain the disclosures mandated by 15 U.S.C. § 1692e(11)." Docket No. 1, at ¶ 18.

On October 23, 2007, PRA filed a motion to dismiss plaintiff's claims for failure to state a cause of action. *See* Docket Nos. 6-7. On November 5, 2007, plaintiff filed her opposition to PRA's motion. *See* Docket No. 10. The motion has not been decided by the Court because the parties requested a mediation of the case before a decision was issued.

## C. The January Mediation

On January 15, 2008, the parties mediated the case before Judge Dohnal and reached a tentative class action settlement. The preliminary settlement reached at the January mediation is set forth in the Agreement. *See* Exhibit A, Agreement.

The Agreement contains several preliminary settlement terms, including the amount each class member would receive under the settlement. The Agreement states: "PRA will offer as the settlement of this case for each class member a payment of 50% for the total amount of the class member's sued upon account, never to exceed $4,000, provided that the account or judgment is paid in full prior to 6 months of the date of notice sent to consumers." *Id.* at p. 1, ¶ 6.

During the mediation, there was considerable discussion regarding the tax consequences of the preliminary settlement for participating class members. Opposing counsel contended there was no tax ramification; undersigned counsel was unsure, but accepted opposing counsel's representation and included in the agreement the following language: "The 50% factor is considered a payment by PRA to consumers and PRA will attempt to confirm that there is no 1099C notice and liability for consumers who take advantage of this settlement." *Id.* at p. 2, ¶ 8.

In addition to requiring that an agreed-upon class action notice be sent to each class member, the Agreement also requires Judge Dohnal send a "mutually agreed-upon letter" to each

class member "detailing the benefits of the settlement." *Id.* at pp. 1-2, ¶ 7.

The Agreement also contains several limiting terms, indicating the parties never intended to be bound until and unless further negotiation occurred. For example, the Agreement states "[t]he parties will detail a specific plan to ensure that class counsel has the opportunity to address any claim raised by a class member." *Id.* at p. 2, ¶ 10. The Agreement also states "[c]ounsel will jointly prepare a final report, or interim reports as requested by the Court confirming all details of this settlement for final submission to the Court." *Id.* at p. 2, ¶ 13. Most importantly, the Agreement opens by stating the Agreement is "subject to the completion of a formal settlement agreement and the submission of the necessary pleadings[.]" *Id.* at p. 1.

Notwithstanding the limiting language, a disagreement has arisen since the January mediation as to the ultimate fairness and enforceability of the Agreement as a class action settlement agreement. The purpose of PRA's strike motion is to resolve the ongoing dispute.

### III. LAW AND ARGUMENT

"[Fed. R. Civ. P. 23] governs class actions in Federal Court and provides district courts with the authority to manage class actions[.]" *Edwards v. Accredited Home Lenders, Inc.*, 2008 WL 1756364, *2 (S.D. Ala. 2008). In relevant part, Rule 23 provides, "[i]n conducting an action under this rule, the court may issue orders that . . . determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument . . . or deal with similar procedural matters." Fed. R. Civ. P. 23(d)(1)(A)-(E). Rule 23 also states "[t]he claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e).

Pursuant to Fed. R. Civ. P. 23, the Court should strike the Agreement and confirm this case is not settled as a class action. As discussed below, the Agreement cannot be enforced as a class action settlement agreement per Fed. R. Civ. P. 23.

*A.  The Agreement Is Unenforceable Because It Is an "Incomplete Agreement"*

"[S]ettlement agreements are treated as contracts subject to the general principles of contract interpretation." *Byrum v. Bear Inv. Co.*, 936 F.2d 173, 175 (4th Cir. 1991). "[D]isputes concerning a settlement agreement are to be resolved under the principles applicable to contracts generally." *Bailey v. Potter*, 2006 WL 1582410, \*3 (E.D. Va. 2006).

"To interpret the contract, *i.e.*, to ascertain the sense and meaning of the language setting forth each party's contractual obligations, the [c]ourt must look to their objective manifestations of intent.  The clearest manifestation of intent is the contract's plain language." *Silicon Image, Inc. v. Genesis Microchip, Inc.*, 271 F.Supp.2d 840, 850 (E.D. Va. 2003) (citation omitted). "If the terms of the contract are clear and unambiguous, then [the court] must afford those terms their plain and ordinary meaning; however, if the terms are vague or ambiguous, then [the court] may consider extrinsic evidence to interpret those provisions." *Providence Square Associates, L.L.C. v. G.D.F., Inc.*, 211 F.3d 846, 850 (4th Cir. 2000).

However, "[t]he court cannot enforce a settlement until it concludes that the parties have reached a *complete agreement*." *Silicon Image*, 271 F.Supp.2d at 847 (emphasis added). "If the court determines that such a settlement agreement is only a partial settlement, then it should reject the whole." *Columbus-America Discovery Group v. Atlantic Mut. Ins. Co.*, 203 F.3d 291, 299 (4th Cir. 2000); *see also Wood*, 528 F.2d at 426 ("There is no such thing as half settlement or even 95 percent settlement.  It is for the district court either to implement a complete settlement agreed upon by the parties or to restore them to the status quo prior to partial execution of an aborted contract.  There can be no in-between.  It is settlement *vel non*."). As the Fourth Circuit has ruled:

> [T]he district court only retains the power to enforce *complete* settlement agreements; it does not have the power to impose, in the role of a final arbiter, a

> settlement agreement where there was never a meeting of the parties' minds. Where there has been no meeting of the minds sufficient to form a complete settlement agreement, any partial performance of the settlement agreement must be rescinded and the case restored to the docket for trial.

*Ozyagcilar v. Davis*, 701 F.2d 306, 308 (4th Cir. 1983) (emphasis in original) (citation omitted).

In summary, in order "to exercise its inherent power to enforce a settlement agreement, a district court (1) must find that the parties reached a *complete agreement* and (2) must be able to determine its terms and conditions." *Hensley v. Alcon Laboratories, Inc.*, 277 F.3d 535, 540-41 (4th Cir. 2002) (emphasis added); *see also Moore v. Beaufort County, N.C.*, 936 F.2d 159, 162 (4th Cir. 1991) (same). "If a district court concludes that no settlement agreement was reached or that agreement was not reached on all the material terms, then it must deny enforcement." *Hensley*, 277 F.3d at 541; *see also Silicon Image*, 271 F.Supp.2d at 847.

The Agreement here is an unenforceable "incomplete agreement" for 2 reasons. First, the Agreement is merely an "agreement to agree." In other words, the parties never intended to be bound by the Agreement, until and unless additional material terms were negotiated and a formal class action settlement agreement was signed. Second, as a matter of law, the Agreement is *not* enforceable because the parties never reached an agreement on all material terms or settlement documents.

### *1. The Agreement Is Unenforceable Because It Is Merely an "Agreement to Agree"*

"There is a strong presumption against finding [a] binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents." *Brown v. Cara*, 420 F.3d 148, 154 (2d Cir. 2005) (quotation marks omitted); *see also Teachers Ins. and Annuity Ass'n of America v. Tribune Co.*, 670 F.Supp. 491, 499 (S.D. N.Y. 1987); *Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership*, 734 F.Supp. 1181, 1188 (D. Md. 1990). Further, "[i]t is fundamental to contract

law that mere participation in negotiations does not create a binding obligation, *even if agreement is reached on all terms.* More is needed than agreement on each detail—*the parties must have intended to enter into a binding agreement.*" *Burbach Broadcasting Co. of Delaware v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002) (emphasis added).

The Agreement here was expressly contingent upon further negotiation and the execution of a formal class action settlement agreement. The Agreement requires further negotiation regarding the terms of "a mutually agreed-upon letter" to be issued by Judge Dohnal "detailing the benefits of the settlement." Exhibit A, Agreement, at pp. 1-2, ¶ 7. The Agreement requires further negotiation regarding "a specific plan to ensure that class counsel has the opportunity to address any claim raised by a class member." *Id.* at p. 2, ¶ 10. The Agreement also requires further negotiation regarding a joint "final report, or interim reports as requested by the Court confirming *all details* of [the] settlement for final submission to the Court." *Id.* at p. 2, ¶ 13 (emphasis added). And most importantly, the Agreement states that the parties' agreement is "subject to the completion of a formal settlement agreement and the submission of the necessary pleadings[.]" *Id.* at p. 1. These words evince an intent *not* to be bound, *until and unless* a final and formal class action settlement agreement was signed by the parties. *See, e.g., R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1984) ("To begin with, it is not surprising that considerable weight is put on a party's explicit statement that it reserves the right to be bound only when a written agreement is signed. Courts are reluctant to discount such a clear signal, and it does not matter whether the signal is given during the course of bargaining, or at the time of the alleged agreement.") (gathering authorities); *ABC Trading Co., Ltd. v. Westinghouse Elec. Supply Co.*, 382 F.Supp. 600, 601 (E.D. N.Y. 1974) ("It is everywhere agreed that if the parties contemplate a reduction to writing of their agreement before it can be

considered complete, there is no contract until the writing is signed.") (quotation marks and ellipses omitted).   Said another way, the parties never intended the Agreement to be a binding class action settlement agreement.  *See Burbach Broadcasting*, 278 F.3d at 406.   In light of this fact, the Agreement is unenforceable because it is at most merely an "agreement to agree."  *See, e.g., Phoenix Mut. Life Ins.*, 734 F.Supp. at 1187 ("As a matter of law, the clear intent of the parties was that no binding agreement would become effective until a comprehensive agreement had been executed."); *EG&G, Inc. v. Cube Corp.*, 2002 WL 31950215, *6 (Va. Cir. Ct. 2002) ("[W]here the evidence is that the parties merely *agreed to make an agreement* in the future, and where a determination of the terms and conditions under which the obligation would be assumed are vague and uncertain, Virginia law treats such agreements as unenforceable 'agreements to agree.'") (emphasis in original); *Forest v. Kentucky-Ohio Gas Acquis. Corp.*, 1999 WL 33117234 (Va. Cir. Ct. 1999) (finding agreement unenforceable as settlement agreement because, *inter alia*, agreement was "subject to final documentation," which evinced an intent *not* to be bound until and unless the final agreement was drafted and executed); *Kay v. Professional Realty Corp.*, 281 S.E.2d 820, 822 (Va. 1981) (agreement to agree unenforceable).

### 2.   The Agreement Is Unenforceable Because the Parties Did Not Agree On All Material Terms and Settlement Documents

"A district court cannot enforce a settlement agreement if the evidence reveals that the parties did not reach an agreement or that they did not agree on all the material terms.   If the [c]ourt determines that there was no meeting of the minds, *i.e.*, that there was never complete agreement on the material settlement terms, then the action must be restored to the calendar and come to trial with the parties placed in precisely the same position as they occupied before the putative settlement."  *Silicon Image*, 271 F.Supp.2d at 847 (citation omitted).

In a class action settlement, the parties must agree upon a multitude of important terms

and conditions.  Indeed, most class action settlement agreements are lengthy and include several exhibits.  In contrast, the Agreement here, which is signed by only the lawyers and neither of the parties, is very short and fails to address the following material terms to a class action settlement:

> The content of the class action notice;
> The procedure for class members to object to the settlement;
> The procedure for class members to exclude themselves from the settlement;
> The administration of settlement payments;
> The content of the preliminary approval order;
> The content of the final order and judgment;
> The content of the letter from Judge Dohnal; and
> The scope of confidentiality.

As explained below, the preliminary settlement terms memorialized in the Agreement will *not* benefit some of the class members.  Some of the class members will actually be harmed by the preliminary settlement terms.  Considering this disparate treatment of the class members, the parties will *not* reach an agreement on the content of the class action notice, which must describe the benefits of the proposed settlement.  Nor will the parties reach an agreement on the content of the letter from Judge Dohnal, which per the Agreement is supposed to detail "the benefits of the settlement," or the preliminary approval order, or final order and judgment.  With this backdrop, the Court should strike the Agreement and enter an order confirming this case is *not* settled as a class action because the parties have not reached, and will not reach, an agreement on all material terms and settlement documents.

### 3.  *The Agreement Is Not a Binding and Enforceable "Preliminary Agreement"*

"[Some] courts have recognized two kinds of preliminary agreements that are binding and enforceable."  *Burbach Broadcasting*, 278 F.3d at 407.  In *Burbach*, the Fourth Circuit discussed *Teachers*, wherein the court analyzed 2 types of binding and enforceable preliminary agreements.  The *Teachers* court distinguished between the 2 types of agreements as follows:

Preliminary contracts with binding force can be of at least two distinct types.  One

10

occurs when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation. Such an agreement is preliminary only in form—only in the sense that the parties desire a more elaborate formalization of the agreement. The second stage is not necessary; it is merely considered desirable. . . .

The second and different sort of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement. To differentiate this sort of preliminary agreement from the first, it might be referred to as a binding preliminary commitment. Its binding obligations are of a different order than those which arise out of the first type discussed above. The first type binds both sides to their ultimate contractual objective in recognition that that contract has been reached, despite the anticipation of further formalities. The second type—the binding preliminary commitment—does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the alternate objective within the agreed framework. In the first type, a party may lawfully demand performance of the transaction even if no further steps have been taken following the making of the "preliminary" agreement. In the second type, he may not. What he may demand, however, is that his counterparty negotiate the open terms in good faith toward a final contract incorporating the agreed terms. *This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final contract.* It is also possible that the parties will lose interest as circumstances change and will mutually abandon the negotiation. The obligation does, however, bar a party from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.

*Teachers*, 670 F.Supp. at 498 (emphasis added) (citations omitted).

In *Burbach*, the Fourth Circuit noted "West Virginia law is silent as to whether it recognizes the second type of binding agreement[.]" *Burbach Broadcasting*, 278 F.3d at 408-09. The court, therefore, remanded the case to district court, stating:

On remand, we encourage the district court to ensure that West Virginia recognizes Type II agreements and does not follow Kentucky's "all or nothing" approach. Though many jurisdictions recognize agreements to negotiate in good

> faith and have ordered specific performance or imposed a measure of damages for a party's failure to so negotiate, Kentucky takes the traditional approach—either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less.

*Id.* at 409, n. 7.

This Court recently ruled that Virginia does *not* recognize Type II agreements as binding and enforceable agreements. *See Beazer Homes Corp. v. VMIF/Anden Southbridge Venture*, 235 F.Supp.2d 485, 491-92 (E.D. Va. 2002). The Court noted "Virginia law, unlike West Virginia law, is not silent on this subject, but rather clearly endorses the traditional rule that *such contracts are unenforceable.* Indeed, Virginia law in this respect is uniform and longstanding." *Id.* at 491 (emphasis added). The Court, therefore, found "[g]iven [the] recent, clear, and controlling precedent, there is no doubt that Virginia law does *not* currently recognize binding preliminary agreements as described in *Burbach*." *Id.* at 492 (emphasis added).

Although Virginia law does *not* recognize binding and enforceable "preliminary agreements," even if *Burbach* were applied in interpreting the Agreement here, the Agreement is an unenforceable Type II preliminary agreement.

In *Burbach*, the Fourth Circuit endorsed consideration of the following 5 factors in determining whether the parties intended to form a binding Type II agreement:

1) the language of the agreement;
2) the existence of open terms;
3) whether there has been partial performance;
4) the context of negotiations; and,
5) the custom of such transactions.

*Burbach Broadcasting*, 278 F.3d at 408. "The first factor, the language of the agreement, is arguably the most important factor in a court's analysis." *Id.*

The 5 *Burbach* factors require a finding that the Agreement is at most an unenforceable Type II agreement.

12

### a. The Language of the Agreement Requires Further Negotiation

As noted above, the language of the Agreement requires further negotiation regarding several issues. The parties did *not* contemplate they would be bound to any class action settlement, until and unless additional issues and settlement documents were agreed upon. This first factor requires a finding that the Agreement is at most a Type II agreement.

### b. There Are Numerous "Open Terms"

Again as noted above, there are numerous "open terms" that have *not* been agreed upon by the parties, *e.g.*, class action notice, letter from Judge Dohnal, preliminary approval order, and final order and judgment. This second factor likewise requires a finding that the Agreement is at most a Type II agreement.

### c. There Has Been No Performance

There has *not* been any performance of any of the settlement terms. Again, this third factor requires a finding that the Agreement is at most a Type II agreement.

### d. The Context of the Negotiations

At the January mediation, the parties reached a preliminary agreement on some of the terms of a proposed class action settlement, *but* these terms were subject to further discussion, negotiation, and research. The context of the settlement negotiations was such that everyone understood that no "final deal" was reached—additional work was necessary. This is *not* an uncommon practice in negotiating class action settlements. Often times, parties in a complex matter will execute a preliminary settlement agreement, which will form the framework for the eventual formal settlement agreement. Such preliminary agreements are, however, rarely intended to be the "last word" on settlement. *See Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 262-63 (2d Cir. 1984) ("Thus, the magnitude and complexity of the deal as reflected in the

numerous written contract drafts not only reinforce the parties' stated intent not to be bound until written contracts were signed, but also reflect a practical business need to record all the parties' commitments in definitive documents.  Since the parties intended not to be bound prior to execution of those written documents and since none was ever executed, no contract came into existence.").  Instead, such preliminary agreements are used as helpful guideposts to outline the issues and draft the definitive settlement documents. *Id.*

Considering that the purpose of the Agreement here was only to memorialize the preliminary settlement terms, and the settlement was contingent upon further negotiation and execution of a formal class action settlement agreement, the fourth factor, *i.e.*, context of the negotiations, requires a finding that the Agreement is at most a Type II agreement.

### e. The Custom of Such Transactions

"Unlike other civil actions, the dismissal or settlement of a class action lawsuit requires the approval of the Court[.]" *Strang v. JHM Mortg. Securities Ltd. Partnership*, 890 F.Supp. 499, 501 (E.D. Va. 1995); *see also In re Jiffy Lube Securities Litigation*, 927 F.2d 155, 158 (4th Cir. 1991) ("Rule 23(e) provides that 'a class action shall not be dismissed without the approval of the court.'") (*quoting* former Fed. R. Civ. P. 23(e)).  As the Fourth Circuit has noted, the process for settling a class action is "laborious." *Shelton v. Pargo, Inc.*, 582 F.2d 1298, 1311 (4th Cir. 1978).

When settling a class action, customarily the parties and their lawyers sign a formal class action settlement agreement.  The formal agreement is usually detailed and includes several exhibits, including proposed orders.  Customarily the drafting process takes time and results in multiple iterations of an agreement before the final agreement is reached.  This process is necessary because of the complexity of class action settlements. *See, e.g., Phoenix Mut. Life*

*Ins.*, 734 F.Supp. at 1188 ("The large amounts involved and the complexity of this transaction highlight the practical business need to have the parties' legal obligations recorded in formal documents.").

No formal class action settlement agreement was signed by the parties here.  As noted above, there are many terms and settlement documents the parties have not discussed or agreed upon.  In light of this fact, the fifth and final factor, *i.e.*, custom of such transactions, requires a finding that the Agreement is at most a Type II agreement.

### *f. PRA Negotiated In Good Faith, But Was Unable To Reach A Final Class Action Settlement Agreement*

The 5-factor *Burbach* test establishes the Agreement is at most a Type II agreement.  *See Burbach Broadcasting*, 278 F.3d at 408.  As the *Teachers* court ruled, "[t]his [type of agreement] does *not* guarantee that the final [agreement] will be concluded if both parties comport with their obligation, as good faith differences in the negotiation of the open issues may prevent a reaching of final [agreement]."  *Teachers*, 670 F.Supp. at 498.

To the extent *Burbach* applies to the Agreement, PRA has negotiated in good faith with plaintiff and her counsel, but has been unable to reach a final class action settlement agreement.  As discussed below, one obstacle to final settlement relates to the Agreement's improper disparate treatment of class members.  In light of this disparity, and the unlikelihood that the preliminary settlement would be approved by the Court because of this settlement flaw, the parties will not agree upon a final class action settlement agreement (including the class action notice, letter from Judge Dohnal, preliminary approval order, and final order and judgment), unless the preliminary settlement terms are renegotiated.  The Court should strike the Agreement and enter an order confirming this case is *not* settled as a class action.

*B.  The Agreement Is Unenforceable Because a Material Settlement Term Cannot Be Satisfied*

"Rule 23(e) wisely requires court approval of the terms of any settlement of a class

action, but the power to approve or reject a settlement negotiated by the parties before trial does

not authorize the court to require the parties to accept a settlement to which they have not

agreed." *Evans v. Jeff D.*, 475 U.S. 717, 726 (1986).  Said another way, "the district court's

power to approve or reject class action settlements under Rule 23(e) of the Federal Rules of Civil

Procedure does not permit it to modify the terms of a negotiated settlement." *Cox v. Shah*, 1999

WL 492664, *7 (4th Cir. 1999).  The Ninth Circuit has explained the rule as follows:

> [I]t must be recognized that [a court] [is] not presented with a choice between
> alternative remedies.  Neither the district court nor [the appellate court] is
> empowered to rewrite the settlement agreed upon by the parties.  [The court] may
> not delete, modify, or substitute certain provisions of the [settlement agreement].
> Of course, the district court may suggest modifications, but ultimately, it must
> consider the proposal as a whole and as submitted.  Approval must then be given
> or withheld.  [The] only alternatives on appeal are to vacate and remand upon a
> determination that the district court abused its discretion, or to affirm its
> judgment.  In short, the settlement must stand or fall as a whole.

*Officers for Justice v. Civil Service Com'n of City and County of San Francisco*, 688 F.2d 615,

630 (9th Cir. 1982); *see also In re Warner Communications Securities Litigation*, 798 F.2d 35,

37 (2d Cir. 1986) ("Indeed, it is not a district judge's job to dictate the terms of a class

settlement; he should approve or disapprove a proposed agreement as it is placed before him and

should not take it upon himself to modify its terms.").

During the January mediation, opposing counsel was adamant that PRA was *not*

obligated to issue 1099 forms to class members participating in the settlement.  Due to the

importance of this material term to opposing counsel, and in an attempt to protect PRA, the

following language was included in the Agreement:  "PRA will attempt to confirm that there is

no 1099C notice and liability for consumers who take advantage of this settlement."  Exhibit A,

Agreement, at p. 2, ¶ 8.  After researching this important tax issue, PRA learned opposing counsel is wrong.  As a matter of law, a defendant in a class action settlement *must* issue a 1099 to any class member who receives:  (a) a settlement payment of $600 or more, or (b) a discharge of indebtedness of $600 or more.  *See* 26 U.S.C. § 6041; 26 U.S.C. § 6050P.

Considering the material term of the settlement regarding no 1099s cannot be satisfied, the Agreement cannot be enforced.  Further, as explained above, neither plaintiff nor the Court can compel PRA to revise the terms of the preliminary settlement to exclude the material settlement term regarding the tax consequences of the settlement to the class members.  *See Evans*, 475 U.S. at 726.  Therefore, even though plaintiff and her counsel are now willing to exclude from the preliminary settlement the term regarding no 1099s and permit 1099s to be issued to participating class members, this after-the-fact willingness on the part of plaintiff and her counsel are of no moment.  Simply put, issuance of 1099s was never part of the original deal and PRA cannot be forced to accept a different deal now merely because the original deal cannot be fulfilled.  *Id.*

Moreover, the tax (1099) issue not only highlights the lack of any "meeting of the minds" on an important settlement term, but also materially affects the overall fairness of the proposed class action settlement.  When evaluating the fairness of the preliminary settlement at the January mediation, PRA and its counsel were operating under opposing counsel's adamant representation that no 1099s would need to be issued.  Now that this representation has been proven false, the ultimate fairness of the settlement is placed in question.  As explained below, the preliminary settlement reached at the January mediation cannot be approved per Fed. R. Civ. P. 23(e) because of its disparate treatment of class members.  The Court should strike the Agreement and enter an order confirming this case is *not* settled as a class action.

*C.  The Preliminary Settlement Cannot Be Approved Per Fed. R. Civ. P. 23(e)*

"The primary concern addressed by Rule 23(e) is the protection of class members whose rights may not have been given adequate consideration during the settlement negotiations." *In re Jiffy Lube*, 927 F.2d at 158. "The courts have recognized that the duty owed by class counsel is to the *entire class* and is not dependent on the special desires of the named plaintiffs." *Parker v. Anderson*, 667 F.2d 1204, 1211 (5th Cir. 1982) (emphasis added); *see also Heit v. Van Ochten*, 126 F.Supp.2d 487 (W.D. Mich. 2001) (same).  One authority describes the role of attorneys in the class action settlement process as follows:

> Counsel for the parties are the court's main source of information about the settlement.  The judge should ensure that counsel meet their obligations to disclose fully all agreements and understandings, including side agreements with attorneys or class members and be prepared to explain how the settlement was reached and why it is fair and reasonable.  *Counsel must also disclose any facet of the settlement that may adversely affect any member of the class or may result in unequal treatment of class members.*

Manual for Complex Litigation, § 21.641 (4th ed.) (emphasis added); *see also* Va. Rules of Prof. Conduct, Rule 3.3 (candor to the tribunal); *Thomas v. Albright*, 77 F.Supp.2d 114, 122 (D. D.C. 1999) ("Class counsel is required to act in the 'best interests of the class considered as a unit.' The Manual for Complex Litigation states clearly that class counsel is responsible for protecting the interests of the class, 'even in circumstances where the class representatives—their direct clients—take a position that counsel consider contrary to those interests.'") (citations omitted).

The Second Circuit has explained:

> [In class actions,] though there will be common questions affecting the claims of the class members, it is not unusual for their interests, especially at the relief stage, to diverge.  Such a divergence presents special problems because the class attorney's duty does not run just to the plaintiffs named in the caption of the case; it runs to all of the members of the class. "Thus, when a potential conflict arises between the named plaintiffs and the rest of the class, the class attorney must not allow decisions on behalf of the class to rest exclusively with the named plaintiffs. In such a situation, the attorney's duty to the class requires him to point out

conflicts to the court so that the court may take appropriate steps to protect the interests of absentee class members."

*In re Agent Orange Product Liability Litigation*, 800 F.2d 14, 18 (2d Cir. 1986) (citation marks omitted).

As explained below, the preliminary settlement set forth in the Agreement creates a conflict among the class members. Although all of the class members allegedly suffered the same purported "injury," they do *not* necessarily receive the same settlement benefit per the Agreement. Such disparate treatment of similarly situated class members in a class action settlement runs afoul of Rule 23.

### 1. The Preliminary Settlement Is neither Fair nor Adequate To All Class Members

"Of special significance is the trial court's role in the supervision and approval of class settlements, based on the criterion of fairness. The attorney's duty to the class requires him or her to make known to the court any conflicts in order that the court may take appropriate steps to protect the interests of all class members." *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 165 (3d Cir. 1984); *see also Strang*, 890 F.Supp. at 501 ("[In a class action,] the [c]ourt must consider factors relevant to determining the fairness and adequacy of the proposed compromise."); *In re MicroStrategy, Inc. Securities Litigation*, 148 F.Supp.2d 654, 663 (E.D. Va. 2001). "[T]he settlement process is more susceptible than adversarial adjudications to certain types of abuse. The interests of lawyer and class may diverge, as may the interest of different members of the class, and certain interests may be wrongfully compromised, betrayed, or 'sold out' without drawing the attention of the court." *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1169 (5th Cir. 1978). Therefore, "[i]n assessing the fairness, adequacy and reasonableness of a proposed [class] settlement, a court should consider many factors. Among these is whether the settlement favors one or more named plaintiffs or any other identifiable

minority of the plaintiff class.   Although there is no rule that a settlement benefit all class members equally, a disparate distribution favoring the named plaintiffs or some minority within the class requires that the court carefully scrutinize whether the settlement on the whole is fair to all members." *Lurns v. Russell Corp.*, 604 F.Supp. 1335, 1336 (M.D. Ala. 1984).   "[I]n a dispute over the allocation of a settlement fund [in a class action], 'the court should not allow a majority, no matter how large, to impose its decision on the minority.'"   *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1148 (11th Cir. 1983).   This is so because "convenience and expediency cannot justify the disregard of the individual rights of even a fraction of the class."   *In re General Motors Corp. Engine Interchange Litigation*, 594 F.2d 1106, 1133 (7th Cir. 1979).

"Some courts have stated that class members with indistinguishable claims must receive settlement awards of equal value.   That is, while the awards need not be identical, they must be of the same worth."   4 Moore's Federal Practice § 23.164[3] (3d ed. 2006); *see also Plummer v. Chemical Bank*, 668 F.2d 654, 659-60 (2d Cir. 1982) (settlement disapproved because class members were treated differently due to factors extraneous to underlying lawsuit).   In other words, "[i]t's perfectly fine to treat class members different from each other because of factors intrinsic to the case being settled.   Class members may, for instance, be awarded differing amounts depending upon the strength of their claims or the degree of their injuries.   *But class members with indistinguishable claims must receive settlement awards of equal value.*   The awards need not be identical, to be sure; they do have to be worth the same."   *Cohen v. Resolution Trust Corp.*, 61 F.3d 725, 730 (9th Cir. 1995) (Kozinski, J., *dissenting*) (emphasis added) (citations omitted); *see also Petruzzi's, Inc. v. Darling-Delaware Co., Inc.*, 880 F.Supp. 292, 300-01 (M.D. Pa. 1995) ("Thus, the *same* type of injury was purportedly sustained by *all* class members, and *all* class members have the *same* right of recovery against [the defendant].

Thus, while disparate treatment of class members may be justified by a demonstration that the favored class members have different claims or greater damages, no such demonstration has been made here.") (emphasis in original) (citations omitted); *Bussie v. Allmerica Financial Corp.*, 50 F.Supp.2d 59, 75 (D. Mass. 1999) ("The Court also finds that any differences in the nature and value of the benefits received by [c]lass members reflect the [s]ettlement's fairness insofar as they are rationally based on objective differences in the positions of the [c]lass members[.]").

In *In re General Motors Corp. Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 779 (3d Cir. 1995), the court rejected a proposed class settlement based upon disparate treatment of the class members. The court ruled:

> The district court also erred by not adequately accounting for the different abilities (not inclinations) of class members to use the settlement. One sign that a settlement may not be fair is that some segments of the class are treated differently from others. Consequently, the fact that the coupon settlement benefits certain groups of the class more than others suggests that the district court did not adequately discharge its duties to safeguard the interests of the absentees.

*Id.* at 808 (citations omitted).

The preliminary settlement here is even more unfair than the settlement in *In re General Motors Corp.* because not only is there disparate treatment of class members here, but certain class members will actually be *harmed* by participating in the settlement. A few examples illustrate the problem.

### 2. Settlement Scenario Examples

The Agreement states: "PRA will offer as the settlement of this case for each class member a payment of 50% for the total amount of the class member's sued upon account, never to exceed $4,000, provided that the account or judgment is paid in full prior to 6 months of the date of notice sent to consumers." Exhibit A, Agreement, at p. 1, ¶ 6.

Consider these examples:

### a. Class Member A Is Harmed

➢ Assume that Class Member A had a $10,000 debt and settled the debt with PRA for $5,000. Per the Agreement, Class Member A must pay PRA $5,000 to qualify the debt as paid in full, then PRA would pay Class Member A $4,000 (representing the $4,000 settlement cap) as a settlement payment. Participation in the settlement would cost Class Member A $1,000.

### b. Class Member B Breaks Even

➢ Assume that Class Member B had a $10,000 debt and settled the debt with PRA for $6,000. Per the Agreement, Class Member B must pay PRA $4,000 to qualify the debt as paid in full, then PRA would pay Class Member B $4,000 (representing the $4,000 settlement cap) as a settlement payment. Participation in the settlement would not benefit Class Member B, who breaks even.

### c. Class Member C Makes Money

➢ Assume that Class Member C had a $10,000 debt and settled the debt with PRA for $7,000. Per the Agreement, Class Member C must pay PRA $3,000 to qualify the debt as paid in full, then PRA would pay Class Member C $4,000 (representing the $4,000 settlement cap) as a settlement payment. Participation in the settlement would be beneficial to Class Member C, who makes $1,000.

As the above examples prove, the class members are treated *differently* per the Agreement, although the "injury" they allegedly suffered is the *same*. Without considering the tax ramifications, the Agreement will not benefit all class members equally and will instead allow some class members to be paid, others to break even, and still others to lose money. Such disparate treatment of class members in a class action settlement is improper. *See, e.g., Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1152 (8th Cir. 1999) ("[U]nfairly disparate treatment of class members runs contrary to Fed. R. Civ. P. 23[.]").

Further, the disparity in treatment is even more pronounced when the tax ramifications of the preliminary settlement are considered. The imposition of tax liability would be most unfair

to those class members who previously settled a "disputed" debt. If a class member disputed his debt and settled his debt for *less than* the full amount, PRA would *not* have issued a 1099C for the difference between the full amount and the settled amount because the difference was never owed. *See* 26 U.S.C. § 6050P; Priv. Ltr. Rul. 200802012 (Jan. 11, 2008). Each class member who receives a settlement check of $600 or more per the settlement, however, will be issued a 1099Misc. for the amount of the check. *See* 26 U.S.C. § 6041; *Johnson v. LPL Financial Services*, 517 F.Supp.2d 1231, 1234 (S.D. Cal. 2007) ("Payments of a judgment or settlement will likely fall within the broad scope of taxable income."). By participating in the settlement, therefore, some class members will be creating tax liability for themselves where there was none before. For example, the hypothetical Class Member B discussed above will *not* "break even" if he disputed his $10,000 debt before settling for $6,000. In his case, he would not have received a 1099C for the $4,000 balance not paid on his debt per the settlement because that amount was not deemed owed. By participating in the settlement, however, Class Member B will create $4,000 of tax liability for himself and will actually lose money. Class Member B's numbers would work like this:

> ➤ Assume that Class Member B had a $10,000 debt that he disputed, but settled with PRA for $6,000. Based upon the dispute, no 1099C was issued to Class Member B. Per the Agreement, Class Member B must pay PRA $4,000 to qualify the debt as paid in full, then PRA would pay Class Member B $4,000 (representing the $4,000 settlement cap) as a settlement payment and issue him a 1099Misc. for the settlement payment. Participation in the settlement would not put any additional money in Class Member B's pocket, but would instead create $4,000 of tax liability for Class Member B, where he had none before.

*3.    Permitting Class Members to "Opt-Out" Does Not Fix the Deficiencies in the Preliminary Settlement*

It is axiomatic that "[t]he existence of an ability to opt out of the class does *not* lessen [the] concern [related to disparate treatment of class members]; otherwise, court approval of a

class settlement would not be required where opt-out instructions are sent to class members." *Plummer v. Chemical Bank*, 91 F.R.D. 434, 442 (S.D. N.Y. 1981) (emphasis added). In light of this settled law, the fact that the preliminary settlement permits class members to exclude themselves (opt-out) of the settlement does not resolve the deficiencies in the alleged settlement.

Further, a class action settlement that encourages certain class members to opt-out is antithetical to Rule 23 and "would deprive Rule 23 class actions of the efficiency and economy of litigation which is a principal purpose of the procedure." *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 553 (1974). With this in mind, even if the parties could agree on a class action notice and letter from Judge Dohnal to advise the class members of the terms of the settlement—and the potential harm posed by the settlement—the notice and letter would effectively discourage certain class members from participating in the settlement and possibly encourage many class members to opt-out of the settlement, all contrary to the fundamental purpose of Rule 23. The Court should strike the Agreement and enter an order confirming this case is *not* settled as a class action.

## IV. CONCLUSION

For the foregoing reasons, the Court should grant PRA's strike motion and strike the Agreement and enter an order confirming this case is *not* settled as a class action.

Respectfully submitted,

By: _____"/s/"_____
            William D. Bayliss

William D. Bayliss, Esquire (VSB No. 13741)
bbayliss@williamsmullen.com
Brendan D. O'Toole, Esq. (VSB# 71329)
botoole@williamsmullen.com
Williams, Mullen, Clark & Dobbins, P.C.
Two James Center
1021 East Cary Street, 17th floor
Richmond, VA 23219
Telephone: (804) 643-1991
Facsimile:  (804 783-6507
*Of Counsel*

David Israel (Louisiana Bar # 7174)(T.A.)
disrael@sessions-law.com
Allison L. Cannizaro (Louisiana Bar # #29951)
acannizaro@sessions-law.com
Bryan C. Shartle, Esq. (Louisiana Bar #27640)
bshartle@sessions-law.com
SESSIONS, FISHMAN & NATHAN, L.L.P.
3850 N. Causeway Blvd., Suite 1240
Metairie, Louisiana  70002
Telephone:  (504) 828-3700
Facsimile:  (504) 828-3737

Attorneys for Defendant,
Portfolio Recovery Associates, LLC

## C E R T I F I C A T E OF SERVICE

I hereby certify that on the 10th day of June, 2008, I will electronically file the foregoing

with the Clerk of Court using the CM/ECF system, which will then send a notification of such

filing (NEF) to the following:

**Matthew James Erausquin**
Consumer Litigation Associates PC
3615-H Chain Bridge Rd
Fairfax, VA 22030
703-273-6080
Fax: 888-892-3512
Email: matt@clalegal.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Leonard Anthony Bennett**
Consumer Litigation Assoc PC
12515 Warwick Blvd
Suite 100
Newport News, VA 23606
757-930-3660
Fax: 757-930-3662
Email: lenbennett@cox.net

"/s/"
William D. Bayliss

William D. Bayliss, Esquire (VSB No. 13741)
bbayliss@williamsmullen.com
Brendan D. O'Toole, Esq. (VSB# 71329)
botoole@williamsmullen.com
Williams, Mullen, Clark & Dobbins, P.C.
Two James Center
1021 East Cary Street, 17th floor
Richmond, VA 23219
Telephone: (804) 643-1991
Facsimile:   (804) 783-6507
*Of Counsel*

David Israel (Louisiana Bar # 7174)(T.A.)
disrael@sessions-law.com
Allison L. Cannizaro (Louisiana Bar # #29951)
acannizaro@sessions-law.com
Bryan C. Shartle, Esq. (Louisiana Bar #27640)
bshartle@sessions-law.com
SESSIONS, FISHMAN & NATHAN, L.L.P.
3850 N. Causeway Blvd., Suite 1240
Metairie, Louisiana  70002
Telephone:  (504) 828-3700
Facsimile:  (504) 828-3737

Attorneys for Defendant,
Portfolio Recovery Associates, LLC

1616776v1